*Williams v. MTA Bus Co.*

# In the
# United States Court of Appeals
## For the Second Circuit

———————

August Term, 2020

(Argued: May 3, 2021        Decided:  August 12, 2022)

Docket No. 20-2985

———————

IKE WILLIAMS,

*Plaintiff-Appellant*,

–v.–

MTA BUS COMPANY,

*Defendant-Appellee*,

CITY OF NEW YORK,

*Defendant*.

———————

B e f o r e :

JOSÉ A. CABRANES, REENA RAGGI, SUSAN L. CARNEY, *Circuit Judges*.

———————

This case concerns the extent of an employer's obligation to provide accommodations to a job applicant with a disability under section 504 of the Rehabilitation Act of 1973 (incorporating the standard set forth in Title I of the Americans with Disabilities Act) and under generally parallel state and city law. *See* 29 U.S.C. § 794; 42 U.S.C. § 12112(b); N.Y. Exec. L. § 290 *et seq.*; N.Y.C. Admin. Code § 8-101 *et seq.* First, we consider whether an applicant who cannot establish a genuine issue of material fact as to whether he is "otherwise qualified" for the desired employment position can survive summary judgment on a failure-to-accommodate claim arising from the employer's preemployment testing protocols. Second, we examine whether Plaintiff-Appellant here, Ike Williams, who is deaf, made such a showing as to the Assistant Stockworker position that he sought, entitling him to pursue a discrimination claim after he was denied the assistance of an American Sign Language interpreter for a preemployment examination. The District Court for the Southern District of New York (Freeman, *Magistrate Judge*) ruled that such a showing was required, and that as a matter of law Williams had not made such a showing. On *de novo* review, we conclude that the district court correctly decided both issues.

**AFFIRMED.**

---

ANDREW ROZYNSKI (David John Hommel, *on the reply brief*), Eisenberg & Baum, LLP, New York, NY, *for Plaintiff-Appellant Ike Williams.*

GABRIELLA PALENCIA, Executive Agency Counsel, *for* David Farber, General Counsel, MTA Bus Company, New York, NY, *for Defendant-Appellee MTA Bus Company.*

---

CARNEY, *Circuit Judge*:

This case concerns the extent of an employer's obligation to provide accommodations such as an American Sign Language interpreter to a disabled individual who wishes to take a preemployment exam but does not show he is otherwise qualified for the position sought. The asserted obligation arises from section 504 of the Rehabilitation Act of 1973 (as interpreted in tandem with the employment provisions of Title I of the Americans with Disabilities Act ("ADA")) and from generally

2

parallel New York State and New York City law. *See* 29 U.S.C. § 794; 42 U.S.C. §§ 12111–12117; N.Y. Exec. L. § 290 *et seq.*; N.Y.C. Admin. Code § 8-101 *et seq.* First, we consider whether an applicant who does not establish a genuine dispute of material fact as to whether he was "otherwise qualified" for the desired employment position can survive a defendant's motion for summary judgment on a failure-to-accommodate discrimination claim. Second, we examine whether Plaintiff-Appellant Ike Williams, who is deaf, made such a showing with regard to the Assistant Stockworker position that he sought at MTA Bus Company ("MTA Bus"). He alleged that MTA Bus discriminated against him on the basis of his disability when it denied him the assistance of an American Sign Language interpreter for its knowledge-based preemployment examination.

The District Court for the Southern District of New York ruled that Williams must show he was "otherwise qualified" for the Assistant Stockworker position to maintain his Rehabilitation Act claim and that, at summary judgment, Williams had not met this requirement. *See Williams v. MTA Bus Co.*, No. 17-cv-7687, 2020 WL 1922911, at *7–*9 (S.D.N.Y. Apr. 20, 2020) (Freeman, *M.J.*) ("*Williams I*"),[1] *reconsideration denied*, 2020 WL 4904058 (S.D.N.Y. Aug. 20, 2020) ("*Williams II*"). On *de novo* review, we agree.

Accordingly, we **AFFIRM** the orders of the district court.

---

[1] The parties consented to have the matter adjudicated by a United States Magistrate Judge. *Williams I*, 2020 WL 1922911, at *1; *see* 28 U.S.C. § 636(c).

## BACKGROUND

### I. Factual Background[2]

Plaintiff-Appellant Ike Williams was born hard of hearing and is entirely deaf in his right ear. His primary language is American Sign Language ("ASL"). The National Institute on Deafness and Other Communication Disorders ("NIDCD") describes ASL as "a complete, natural language that has the same linguistic properties as spoken languages, with grammar that differs from English. ASL is expressed by movements of the hands and face. . . . [It] is a language completely separate and distinct from English. It contains all the fundamental features of language, with its own rules for pronunciation, word formation, and word order." *American Sign Language*, NIDCD, https://www.nidcd.nih.gov/health/american-sign-language (last updated Oct. 29, 2021). According to the NIDCD, "[ASL] is the primary language of many North Americans who are deaf and hard of hearing and is used by some hearing people as well." *Id.*

Defendant-Appellee MTA Bus is a public benefit corporation that operates bus routes in New York City. It is a subsidiary of New York's Metropolitan Transit Authority and an affiliate of the New York City Transit Authority ("NYCTA").  Under a 2006 memorandum of understanding ("MOU") between MTA Bus and NYCTA, and a 2011 MOU between NYCTA and New York City through its Department of Citywide Administrative Services ("DCAS"), NYCTA develops and administers examinations to individuals who seek consideration for employment opportunities at MTA Bus that are subject to DCAS's rules and regulations. *See* App'x at 81–88, 89–103.

In early January 2016, MTA Bus posted its Notice of Examination No. 6302 (the "Notice"), in which it provided a job description, stated applicable job qualifications

---

[2] The following narrative is drawn from the record at summary judgment. Any relevant disputes are noted.

4

and details, and advertised an upcoming examination for the position called "Assistant Stockworker." *Id.* at 58**.** It set an application deadline of January 26. *Id.*

According to the Notice, MTA Bus employs Assistant Stockworkers in its storerooms and other facilities, where, "under supervision, [they] receive, check, classify, store and distribute materials and supplies."[3] *Id.* The Notice contained a section labeled "HOW TO QUALIFY." That section advised that, "[b]y the last day of the application period, you must have":

1.  Three years of full-time experience as a stock assistant, stock clerk, or stock worker in an industrial, manufacturing, or wholesaling business which stocks railroad, automotive, machine, aircraft or marine maintenance tools, production parts, or plumbing, hardware or sheet metal supplies and tools; or

2.  Two years of full-time experience as described in #1 above and a four-year high school diploma or its educational equivalent; or

3.  A satisfactory equivalent of education and experience.

*Id.* at 59.

The Notice further advised, "You are responsible for determining whether you meet the qualification requirements for this examination prior to submitting the application. If you are marked 'Not Qualified,' your application fee will **not** be refunded and you will **not** receive a score." *Id.* (emphasis in original). Among other

---

[3] The specific responsibilities of the position "include[]: the operation of all material handling equipment; data processing and maintenance of inventory transaction documents; the loading and unloading of trucks; all activities related to normal warehousing and distribution functions; keep records; take inventory; handle obsolete and scrap materials; drive[] automotive vehicles; and perform related work." App'x at 58.

"requirements to be appointed," such as having a valid New York State driver's license, the Notice cautioned, in accordance with DCAS General Examination Regulation E.9.1, that the applicant "must be able to understand and be understood in English."[4] *Id.*; *see also* Supp. App'x at 5. Wrapping up its description of the process, it directed: "If you believe you meet the requirements in the 'How to Qualify' section" of the Notice, then submit an application, an "education and experience test paper," and an application fee, by mail. App'x at 60. Then, about ten days before the examination date, the applicant would receive an "admission letter"—in essence, a ticket to the "competitive multiple-choice test." *Id.*

As to the substance of the examination, the Notice explained that it "may include questions on[:] general storeroom receiving, storage and distribution procedures in accordance with requisitions and orders; industrial equipment and hand tools; job related arithmetic; efficient and safe storage practices; preparation of reports; and other related areas."[5] *Id.* If a candidate achieved a grade of 70 or above and met "the education and experience requirements," his or her name would be placed on an "eligible list," ranked in order of the final exam score, ready to be considered for employment and interviewed as the hiring process proceeded. *Id.* at 60–61.

---

[4] A NYCTA representative testified, however, that the examination was not "developed to test the English literacy requirements of the job." App'x at 126. Even if the examination served that function in part, we do not rest our decision on the English language requirement, nor does MTA Bus rely on that ground in defending the district court decision. The record provides no basis for a ruling as to whether the Assistant Stockworker job could be performed by a qualified hearing-impaired individual, with or without accommodation.

[5] The parties have not provided a copy of Examination No. 6302, but the general contents of the exam, as described in the Notice, are not in dispute here, nor is the fact that the examination questions were presented in written English.

Ike Williams, a locksmith by trade and with twenty years' experience in that role, wanted to apply for a locksmith job at MTA Bus, but because no such position was open, he decided to make a bid for the Assistant Stockworker position, to get a "foot in the door." Supp. App'x at 164. In January 2016, Williams applied to take Examination No. 6302, and in June, he received a letter from MTA Bus assigning him an examination date and location. The letter directed that any requests for "special accommodations . . . be submitted in writing with documentation . . . by email." App'x at 73. Williams contacted NYCTA to request that NYCTA provide him with "an ASL interpreter to interpret the examination and its instructions." *Id.* at 12.

After communicating over video phone with Jennifer Garcia, an Associate Staff Analyst at NYCTA, Williams went in person to the NYCTA exam unit to discuss his request, writing notes while there to communicate with Garcia. Garcia later testified that she informed Williams then, and confirmed through later email correspondence, that NYCTA does not make ASL interpreters available for the exams, but that in light of his auditory impairment NYCTA would give Williams a written version of the instructions about how to take the exam, which other exam-takers would be given verbally.[6]

On July 1, 2016, Williams took the examination. He received a score of 37.50. To pass, he needed at least 70. Williams alleges that he "would have been able to pass the

---

[6] Garcia said that after their in-person meeting, she gave Williams her email address and invited Williams to email her with any questions. It is not altogether clear from Williams's follow-up emails that he understood that he would not be provided with an ASL interpreter for the exam. In one of those emails, Williams asked, "I want to know Application will planing Sign language interpreter July 1, 2016 right?" App'x at 77. Garcia wrote to Williams, "We do not offer sign language service," and told him that he would "get the instruction in writing." *Id.* Williams responded, "Oh ok Sure mmm I will try do it the best writing," *id.*, and later testified that in response to discovering that there would be no interpreter, "I said okay. I will accept that. I will do my best . . . [b]ut inside I was extremely nervous and thrown off," Supp. App'x at 161.

examination with the reasonable accommodation of an ASL interpreter to interpret the examination and its instructions."[7] App'x at 12.

**II.     Procedural Background**

In October 2017, Williams sued MTA Bus, charging primarily that by failing to provide an ASL interpreter for the exam, it unlawfully discriminated against him based on his disability, thereby violating section 504 of the Rehabilitation Act, the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). Among other relief, he sought a declaratory judgment that MTA Bus's "policies, procedures, and practices have subjected Plaintiff to unlawful discrimination"; an order enjoining MTA Bus "from implementing or enforcing any policy, procedure, or practice that discriminates against deaf and hard-of-hearing individuals" and requiring MTA Bus "to provide in-person ASL interpreters to [Williams] for any examinations in written English"; and damages. App'x at 16–17.

A.     *The summary judgment decision*

In 2020, following the parties' cross-motions for summary judgment, the district court entered judgment for MTA Bus, concluding primarily that because the record showed that Williams was not "otherwise qualified" for the Assistant Stockworker position, he could not establish that MTA Bus discriminated against him on the basis of disability in violation of section 504. *Williams I*, 2020 WL 1922911, at *9. The court likewise concluded that, although the allocation of the burden of proof on this issue differed for Williams's claim under the NYCHRL, the result was the same because there was no genuine dispute of fact regarding Williams's lack of qualifications for the position. Having so concluded, it declined to consider whether the accommodation

---

[7] The parties identify no basis in the record for proving or disproving this allegation.

Williams requested for the examination was otherwise reasonable. For the same reason, the court dismissed Williams's claim that MTA Bus acted unlawfully by failing to engage in the statutorily prescribed interactive processes, explaining that a candidate had to be qualified for the position sought in order to require a prospective employer to engage in those processes.[8]

B.     *The* Frilando *decisions*

Two days after the district court issued its summary judgment decision, Judge Lorna G. Schofield in the Southern District of New York decided a similar case, but in a markedly different fashion and reaching a contrary result. *Frilando v. N.Y.C. Transit Auth.*, 463 F. Supp. 3d 501 (S.D.N.Y. 2020) ("*Frilando I*") (Schofield, J.).[9]

The plaintiff in *Frilando I*, Kenneth Frilando, applied for three positions within NYCTA: bus operator, train operator, and track worker. *Id.* at 508. He requested an ASL interpreter for the exams related to those positions, but NYCTA offered to provide him with such interpretation for only the instructions, not the exam questions and answers. *Id.* at 508–09. Frilando decided not to take the exams and then sued NYCTA, charging disability discrimination. *Id.* at 509. On cross-motions for summary judgment, the district court determined that requiring Frilando to show that he could perform the essential functions of the positions "would be contrary to case law and the ADA's protections for individuals in the job application process." *Id.* at 515. The court reasoned that, in considering a disability discrimination claim, "the Second Circuit focuses on

---

[8] The district court also rejected Williams's Rehabilitation Act claim that MTA's policy of not providing ASL interpreters at the testing phase has an actionable disparate impact on deaf and hard-of-hearing individuals. *Williams I*, 2020 WL 1922911, at \*9–\*10. Williams does not pursue this claim on appeal, and so we treat it as abandoned. *See JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005).

[9] Williams's counsel also represented the plaintiff in *Frilando*.

9

whether an individual could perform the essential functions of the position for which he *seeks accommodations*," *id.* at 514 (emphasis in original), and identified the position for which Frilando sought accommodations as that of the exam-taking applicant, and not of the jobs for which he applied, *id.* at 515. NYCTA did not contest Frilando's "ability to perform essential functions of the exam." *Id.* Because the district court found that Frilando had satisfied the "essential functions of the position" prong of the failure-to-accommodate claim, it then considered whether the offered accommodation (ASL interpretation of the instructions at the start of the exam) was "reasonable." *Id.* Having determined that triable issues of fact existed as to the reasonableness of the accommodations, the court denied summary judgment. *Id.* at 515–17.

Frilando's case proceeded to a bench trial before District Judge Jed S. Rakoff, to whom the case had been transferred. By contrast to Judge Schofield, who had considered Frilando's claim solely under the failure-to-accommodate standard set out in the ADA, 42 U.S.C. § 12112(b)(5)(A),[10] Judge Rakoff split the disability discrimination claim into two: one claim under section 12112(b)(5)(A) for failure to accommodate, and a second under section 12112(b)(7) for failure to provide appropriate preemployment testing.[11] *Compare Frilando I*, 463 F. Supp. 3d at 513 (Schofield, *J.*), *with Frilando v. N.Y.C.*

---

[10] For the reader's convenience, we refer to the sections of the ADA as codified. The failure-to-accommodate standard now codified at § 12112(b)(5)(A) appeared in section 102(b)(5)(A) of the ADA as originally enacted. *See* Americans with Disabilities Act of 1990, Pub. L. No. 101-336, § 102(b)(5)(A), 104 Stat. 327. The phrase "qualified individual," which we discuss at length below and whose definition is codified at § 12111(8), appeared in section 101(8) of the statute as originally enacted.

[11] As we discuss further below, 42 U.S.C. § 12112(b) is the provision of the ADA that establishes the nondiscrimination obligations of employers. *See* 42 U.S.C. § 12111(2) (defining "covered entity"); *id.* § 12112 (prohibiting covered entities from discriminating on the basis of a disability). Section 504 of the Rehabilitation Act, which prohibits disability discrimination under programs or activities receiving federal funds, expressly adopts the substantive standards set out in the ADA's employment provisions. *See* 29 U.S.C. § 794(a), (d).

*Transit Auth.*, 513 F. Supp. 3d 356, 362–63 (S.D.N.Y. 2021) ("*Frilando II*") (Rakoff, *J.*). Regarding the failure-to-accommodate claim, Judge Rakoff determined that to prevail on a discrimination claim under section 12112(b)(5)(A), Frilando *did* have to prove that he was qualified to perform the essential functions of the job at issue—not merely that he was qualified to take the exam. *Id.* at 362–63. Judge Rakoff observed that, separately, and regardless of Frilando's qualifications for the job at issue, Frilando might succeed in establishing a claim for discriminatory preemployment testing under section 12112(b)(7) because that provision "does not repeat the term 'qualified individual,' and thus does not expressly incorporate the requirement that a candidate be able to perform the essential functions of the job." *Id.* at 363.

After making the requisite findings of fact, the district court ruled first that Frilando's failure-to-accommodate claim under section 12112(b)(5)(A) failed because the evidence showed that Frilando was not able to perform the essential functions of any of the three jobs for which he had applied, with or without accommodation. *See id.* at 363–64. The court next ruled that Frilando's discriminatory preemployment exam claim also fell short, because he had failed to prove that the preemployment exams were not intended to measure English comprehension—in other words, the evidence showed that "the exams are designed to test the written comprehension and expression necessary to perform transit job functions," and thus, the examination method was not unlawfully discriminatory under section 12112(b)(7). *Id.* at 634. Third, the court rejected Frilando's interactive-process claim, reasoning that an employer's failure to engage in a good-faith interactive process does not give rise to an independent cause of action and, alternatively, that NYCTA had in fact engaged in a good-faith interactive process with Frilando through its correspondence with him about his requests for accommodations over the course of sixteen months. *Id.* at 365.

11

Frilando appealed both rulings, and that appeal is now pending in our court. *See Frilando v. Metropolitan Transit Auth.*, No. 21-169 (2d Cir. filed Jan. 29, 2021).

C.   *The district court's denial of reconsideration*

After *Frilando I*, Williams asked the district court to reconsider its dismissal of his disability discrimination claims, contending that Judge Schofield's decision showed that the district court had erred in concluding that a job applicant must be "otherwise qualified" for the position sought to prevail. In addition, he asserted for the first time that NYCTA's failure to provide an ASL interpreter for the exam entitled him "[a]t minimum . . . to nominal damages for a technical violation of the law."[12] Pl.'s Br. in Supp. of Mot. for Reconsideration at 5, *Williams v. MTA Bus Co.*, No. 17-cv-7687 (S.D.N.Y. Apr. 27, 2020), ECF No. 58.

The district court denied the motion for reconsideration. *Williams II*, 2020 WL 4904058, at *1. As to the discrimination claim, it explained that it had not overlooked the relevant ADA provisions and that *Frilando I*, as a decision issued *after* it awarded summary judgment in this case, could not serve as a basis for reconsideration. *See id.* at *2. The court further concluded that, in any event, *Frilando I* was not binding on the court, and the fact that the *Frilando I* court interpreted the relevant authority differently was not grounds for reconsideration. *Id.* Regarding Williams's belatedly raised nominal damages argument, the district court briefly observed that Williams "fail[ed] to raise such an argument in his summary-judgment briefing" and that he "cite[d] no

---

[12] In his amended complaint, filed in December 2017, Williams claimed that MTA's violation of section 504 "entitled [him] to compensatory damages, injunctive relief, and an award of attorney's fees, costs, and disbursements." App'x at 14. Although his amended complaint did not demand nominal damages, in his motion for reconsideration Williams asserted that "if a factfinder concludes that [MTA Bus] failed to provide a reasonable accommodation, [he] is entitled to compensatory damages" and "[a]t minimum, [he] would be entitled to nominal damages for a technical violation of the law." Pl.'s Br. in Supp. of Mot. for Reconsideration at 5, *Williams v. MTA Bus Co.*, No. 17-cv-7687 (S.D.N.Y. Apr. 27, 2020), ECF No. 58.

controlling law (or, indeed, any authority at all from within this Circuit) to support the argument." *Id.*

Williams timely appealed the district court's orders granting summary judgment and denying reconsideration.

**III.    Statutory Setting**

As described above, Williams alleges primarily that MTA Bus's refusal to accommodate his disability by providing an ASL translator during the examination constituted unlawful discrimination against him, in violation of section 504 of the Rehabilitation Act, *see* 29 U.S.C. § 794; the NYSHRL, *see* N.Y. Exec. L. § 290 *et seq.;* and the NYCHRL, *see* N.Y.C. Admin. Code § 8-101 *et seq.*

In enacting the Rehabilitation Act, Congress aimed in relevant part "to increase employment opportunities and employment outcomes for individuals with disabilities." 29 U.S.C. § 701(b)(4). Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Id.* § 794(a). For purposes of this appeal, MTA Bus does not dispute that it is an entity covered by section 504.

Congress has directed that courts look to the provisions of the ADA, 42 U.S.C. § 12111 *et seq.*, when adjudicating section 504 claims of employment discrimination. *See* 29 U.S.C. § 794(d) (directing application of ADA standards in Rehabilitation Act matters). The NYSHRL is interpreted coextensively with section 504, but as to the NYCHRL, we have held that "claims under the [NYCHRL] must be given an independent liberal construction," suggesting that its substantive protections may be broader than those provided by federal and state law. *Loeffler v. Staten Island Univ.*

13

*Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (internal quotation marks omitted); *see also*

*Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 30 (App. Div. 1st Dep't 2012)

(explaining that the NYCHRL should "be construed broadly in favor of discrimination

plaintiffs, to the extent that such a construction is reasonably possible" (internal

quotation marks omitted)).

The ADA places a general obligation on covered employers not to discriminate

against "qualified individual[s] on the basis of disability." 42 U.S.C. § 12112(a). It

defines a "qualified individual" as one "who, with or without reasonable

accommodation, can perform the essential functions of the employment position that

such individual holds or desires." *Id.* § 12111(8). The ADA declares the following as its

"general rule":

> No covered entity shall discriminate against a qualified individual
> on the basis of disability in regard to job application procedures, the
> hiring, advancement, or discharge of employees, employee
> compensation, job training, and other terms, conditions, and
> privileges of employment.

*Id.* § 12112(a).

In subsection (b) of section 12112, entitled "Construction," the ADA defines the

term "discriminate against a qualified individual on the basis of disability," "[a]s used"

in its "general rule," to include certain listed actions and omissions. *Id.* § 12112(b). Of

particular relevance here, subsection (b)(5)(A) obligates the employer to make

"reasonable accommodations" for an "otherwise qualified individual with a disability

who is an applicant or employee." *Id.* § 12112(b)(5)(A). Subsection (b)(7) requires the

employer to "select and administer tests concerning employment" in ways that

"accurately reflect" the skills or other factors that the tests "purport[] to measure," as

14

opposed to reflecting the applicant's "impaired sensory, manual, or speaking skills."[13] *Id.* § 12112(b)(7).

As we wrote in *McBride v. BIC Consumer Products Manufacturing Co.*, "a plaintiff makes out a prima facie case of disability discrimination arising from a failure to accommodate" by establishing the following elements:

> (1) Plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

583 F.3d 92, 96–97 (2d Cir. 2009) (internal quotation marks and brackets omitted); *see Lyons v. Legal Aid Soc.*, 68 F.3d 1512, 1515 (2d Cir. 1995). Similar requirements apply to claims of failure to accommodate brought under the NYSHRL or the NYCHRL. *See, e.g.*, *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (applying the ADA standard to NYSHRL claim); *Romanello v. Intesa Sanpaolo, S.p.A.*, 22 N.Y.3d 881, 885 (2013) ("The [NYC]HRL requires that an employer 'make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job . . . .'").

## STANDARD OF REVIEW

Summary judgment may be awarded where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to cross-motions, the district court "evaluate[s] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010) (quoting *Hotel Emps. & Rest. Emps. Union v. City of*

---

[13] For the reader's convenience, we set out the relevant portions of section 12112(a) and (b) in full in the Appendix.

*N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002)). A movant defendant is entitled to summary judgment only "if we conclude that on the record presented, considered in the light most favorable to [the non-movant plaintiff], no reasonable jury could find in his favor on his claim[]." *Capobianco v. City of New York*, 422 F.3d 47, 54–55 (2d Cir. 2005). We review *de novo* "a district court's grant of summary judgment . . . where the parties filed cross-motions for summary judgment and the district court granted one motion but denied the other." *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 943 F.3d 568, 576–77 (2d Cir. 2019) (internal quotation marks, citation, and alterations omitted).

**DISCUSSION**

We understand Williams to raise primarily three challenges to the district court's dismissal of his federal and state disability discrimination claims. *First*, Williams proposes that, based on Congress's failure to use the term "qualified individual" in section 12112(b)(7), employers must provide an applicant with preemployment testing accommodations regardless of whether the applicant is otherwise qualified, with or without accommodation, for the employment position at issue.

*Second*, Williams contends that even if the statute is read to demand that a job applicant be a "qualified individual" to prevail on a disability discrimination claim, the "essential functions of the job" inquiry should focus on whether the individual could perform the essential functions of the employment position *occupied* at the time of the alleged discrimination: in Williams's case, his alleged "position" as an "applicant" or "test-taker," rather than the employment position ultimately *desired*—here, the Assistant Stockworker position. *See* Appellant's Br. at 12 ("When, as here, an applicant is eligible to take a pre-employment test, that should be the end of the inquiry, and the Court need not evaluate whether that applicant can perform the essential functions of the job."), 14

16

("[C]ourts have focused on the position or process that the applicant or employee is seeking accommodations for.").

*Third*, Williams submits that, even if his first two theories fail to persuade, he has adduced sufficient evidence to create a genuine issue of material fact regarding whether he was "otherwise qualified" for the Assistant Stockworker position. Therefore, he reasons, the district court erred by awarding summary judgment, and he is entitled to have a jury decide his claim.

Finally, Williams urges that MTA Bus was not entitled to summary judgment under the NYCHRL, because the NYCHRL provides generally greater protections against disability discrimination than do federal and state law.

We address each argument in turn below.

**I.      Must a job applicant be a "qualified individual" for the employment position held or desired to prevail in a failure-to-accommodate discrimination action?**

We first consider whether a disability discrimination claimant must establish a genuine dispute of material fact regarding whether he is a "qualified individual" for the employment position held or desired to avoid dismissal at the summary judgment stage. We conclude that the federal and state statutes require such a showing.

Williams contends that because the term "qualified individual" does not appear in section 12112(b)(7), regarding testing for employment, job applicants raising failure-to-accommodate claims under that subsection need make no showing at all that they could "perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In support, Williams highlights textual differences between two specific provisions: section 12112(b)(5), regarding an employer's general duty to accommodate employees and applicants, and section 12112(b)(7), regarding an employer's obligations in administering "tests

17

concerning employment." 42 U.S.C. § 12112(b)(7). Subsection (b)(7) defines

"discriminat[ion] against a qualified individual on the basis of disability" to include:

> failing to select and administer tests concerning employment . . . to ensure that, when such test is administered to a job applicant . . . such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant . . . that such test purports to measure, rather than reflecting the impaired . . . skills . . . .

*Id.* As did the court in *Frilando II*, Williams observes that "th[is] preemployment test provision does not repeat the term 'qualified individual'"; it "thus does not expressly incorporate the requirement that a candidate be able to perform the essential functions of the job." Appellant's Reply Br. at 5 (brackets in original) (quoting *Frilando II*, 513 F. Supp. 3d at 363). Therefore, Williams asserts, "[b]ased on plain and unambiguous statutory text . . . this Court need only consider whether Mr. Williams was eligible to take the pre-employment test," not whether he was able to perform the essential functions of the Assistant Stockworker position. *Id.*

In interpreting a statute, we begin of course by giving effect to the plain meaning of the text—"and, if that text is unambiguous," our analysis "usually ends there as well." *United States v. Gayle*, 342 F.3d 89, 92 (2d Cir. 2003). Plain meaning draws on "the specific context in which that language is used." *United States v. Rowland,* 826 F.3d 100, 108 (2d Cir. 2016) (quoting *Yates v. United States*, 574 U.S. 528, 537 (2015) (plurality opinion)). If upon examination we find the text to be ambiguous, we look to traditional canons of statutory construction for guidance in resolving the ambiguity. *See United States v. Dauray*, 215 F.3d 257, 262 (2d Cir. 2000). Then, "[i]f the text of the statute is not entirely clear," we "turn to the broader statutory context and its history." *N.Y. Legal Assistance Grp. v. Bd. of Immigr. Appeals*, 987 F.3d 207, 216 (2d Cir. 2021) (internal quotation marks omitted).

18

*A. The statutory text is not ambiguous.* The text of the ADA tells us that only "qualified individual[s]" can establish a disability discrimination claim. In section 12111(8), Congress defined "qualified individual" for purposes of the ADA as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Next, as described above, subsection (a) of section 12112 states the following as the statute's "general rule" regarding discrimination:

> No covered entity shall discriminate against a *qualified individual* on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

*Id.* § 12112(a) (emphasis added). As highlighted, this declaration of the statute's fundamental prohibition invokes the term "qualified individual," and through that use, it incorporates the requirement that the individual seeking protection under the antidiscrimination provisions be able to "perform the essential functions of the employment position." *Id.* §§ 12111(8), 12112(a). These observations reenforce the understanding that, in this text, Congress sought to determine employers' obligations towards those individuals who are qualified to perform the job in question.

As observed in our initial discussion of the statutory setting, subsection (b) is labeled "Construction," referring to the construction that its subsections provide of the discrimination that subsection (a) prohibits. *Id.* § 12112(b). It introduces the subsections that follow by stating that, "[a]s used in subsection (a), the term 'discriminate against a *qualified individual* on the basis of disability' includes"—followed by a list describing specific actions and omissions that may constitute prohibited conduct by an employer. *Id.* (emphasis added). This introductory clause of subsection (b) thus emphasizes—in keeping with the framing of subsection (a)—that all of the listed actions incorporate the

19

concept of "discriminat[ion] against a qualified individual on the basis of disability." Whether the term "qualified individual" is then repeated, for a third time, in any particular subsection that follows, strikes us as of less importance than Williams's interpretation assigns it.

As described above, Williams contends that the term "qualified individual" must *not* apply to those subparts of section 12112(b) that do not *again* include this phrase, notwithstanding the general rule articulated in subsection (a) and the introductory clause of subsection (b). For example, subsections 12112(b)(3) and (6) prohibit the use of employment and application standards that have the effect of discriminating on the basis of disability, but—like subsection (b)(7)—they do not repeat the term "qualified individual." *Id.* § 12112(b)(3), (6). Williams's proposed reading would eliminate the requirement under those subsections that the employee or applicant, to prevail on a disability discrimination claim, be able to perform the "essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8). That construction, in our view, is inconsistent with the overarching limitation of the discrimination provision to "qualified individual[s]." *Id.* § 12112(a), (b). We find no textual basis to infer that, despite this limitation, Congress—in identifying particular types of discrimination faced by job applicants—intended to permit individuals who are not qualified for their desired employment positions to maintain actions for some types of employment-related discrimination, but not others.

*B. Even were we to consider the text ambiguous, applying the canon against surplusage eliminates any residual ambiguity.* Even assuming, however, that the plain language of section 12112 is ambiguous, the canon against surplusage counsels against adopting a reading that would eliminate the "qualified individual" requirement from several of section 12112(b)'s subparts.

20

We start with the presumption that Congress intended the words in a statute to carry weight. *See Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 602 (2d Cir. 2021) ("[T]he canon against surplusage . . . advises courts to interpret a statute to effectuate all its provisions, so that no part will be inoperative or superfluous." (internal quotation marks omitted)). Williams's proposed construction would render the words "qualified individual" within the phrase "discriminat[ion] against a qualified individual" in section 12112(a) and (b) superfluous, because whether the person discriminated against must be a "qualified individual" would depend entirely on whether the subpart at issue repeats the term.  In other words, Williams's interpretation would mean that Congress intended "discriminat[ion] against a qualified individual" to encompass some forms of discrimination against even an indisputably unqualified individual, rendering the term "qualified individual" inoperative. *See United States v. Peterson*, 394 F.3d 98, 106 (2d Cir. 2005) (explaining that a proposed statutory interpretation rendering certain words "superfluous . . . violates the well-known canon of statutory construction that a statute should not be construed to render a word or clause inoperative"). We presume that Congress intended the words "qualified individual" in section 12112(a) and (b) to have meaning, and therefore we infer that Congress intended the "qualified individual" requirement to apply to all forms of actionable employment discrimination under section 12112.[14]

---

[14] We do not view the repetition of the term "qualified individual" in certain subparts of section 12112(b) as presenting a similar surplusage problem. Those subparts that include "qualified individual" or an equivalent phrase generally describe discriminatory acts that an employer takes against a particular person, *e.g.* 42 U.S.C. § 12112(b)(4) ("excluding or otherwise denying equal jobs or benefits to a qualified individual"), so identifying the object of discrimination is necessary, unlike in the subparts that describe discriminatory policies that apply across the board, *e.g. id.* § 12112(b)(3) ("utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability"). Although we recognize that there are some exceptions to this pattern—notably, subpart (b)(1) describes "limiting, segregating, or classifying *a job applicant or employee* in a way that adversely affects [his] opportunities or

*C. The statutory scheme reenforces our interpretation.* The plain meaning of a statutory provision may be "understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency*, 846 F.3d 492, 513 (2d Cir. 2017) (citation omitted). Reading the statute to maintain the "qualified individual" requirement is consistent with both the ADA and the Rehabilitation Act, considered together as a whole. As explained above, the ADA's employment discrimination provisions work together: section 12111(8) defines "qualified individual"; section 12112(a) prohibits discrimination against "qualified individual[s] on the basis of disability"; and section 12112(b) lists the type of discriminatory actions against "qualified individuals" that are covered under the Act. 42 U.S.C. §§ 12111(8), 12112(a)–(b). Considering the interactive relationship between these provisions, it would be nonsensical to disregard the term "qualified individual" when reading section 12112(b)'s subparts; rather, read together, the statute's provisions instruct that only "qualified individuals" may bring a claim based on the discriminatory acts enumerated in section 12112(b).

Section 504 of the Rehabilitation Act echoes that only an "otherwise qualified individual" can sustain a discrimination claim under that section. 29 U.S.C. § 794(a). Thus, unlike our interpretation, Williams's proposed reading—which would effectively nullify the "qualified individual" requirement for certain categories of discrimination under both Acts—does not jibe with the scheme of the Rehabilitation Act and the ADA. *See Catskill Mountains*, 846 F.3d at 513 ("[T]he words of a statute must be read in their

---

status," omitting the term "qualified individual" while still identifying the object of discrimination—we nonetheless believe our reading best makes sense of Congress's choice to include "qualified individual" in some subparts but not others.

22

context and with a view to their place in the overall statutory scheme." (citation omitted)).

D. *This interpretation harmonizes with the EEOC guidance.* Williams contends that guidance from the Equal Employment Opportunity Commission ("EEOC"), the federal agency responsible for enforcing Title I of the ADA, supports his argument. On occasion, we consult interpretative guidance from the EEOC in construing statutes within the EEOC's regulatory portfolio. *See, e.g.*, *Woolf v. Strada*, 949 F.3d 89, 95 (2d Cir. 2020); *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 95–96 (2d Cir. 2003). The agency's interpretation is not binding on this Court, however, and, because we can discern the statute's meaning based on its plain language, we need not go further. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000).

Even so, we observe that the EEOC guidance referenced by Williams reiterates that "[a]n employer must provide a reasonable accommodation to a *qualified* applicant with a disability that will enable the individual to have an equal opportunity to participate in the application process and to be considered for a job." EEOC, *Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA*, Question 13 (Oct. 17, 2002), https://www.eeoc.gov/policy/docs/accommodation.html (emphasis added). We read this language as we do the statute: to prevail on a discrimination claim based on an employer's failure to provide accommodations during the application process, a plaintiff must show that he was qualified for the employment position at issue.

In any event, this portion of the guidance concerns a prospective employer's obligations with respect to an applicant "with disabilities who meet[s] initial requirements to be considered for a job" but requires on-the-job accommodations that "the employer speculates . . . it will be unable to provide." *Id.* It does not address the employer's obligations regarding an applicant who could not perform the essential

23

functions of the position regardless of any on-the-job accommodations, and therefore is of little assistance in resolving the interpretive issue before us.

*E. In conclusion.* The plain language of the statute, read in context, and reenforced by applying other tools of statutory construction, confirms that Williams's proposed reading is incorrect. We conclude that the phrase "qualified individual" in section 12112(a) and (b) of the ADA applies to all of section 12112(b)'s subparts.

**II.** **To be "otherwise qualified" for the employment position held or desired, is an applicant required to meet the requirements of the desired job or merely the requirements of the "test-taker" position?**

Having determined that the term "qualified individual" is incorporated into all subparts of section 12112(b), we next consider whether the definition of "qualified individual" includes individuals who may be qualified to take preemployment exams but are not qualified for the position applied for. Williams posits that the inquiry into whether an individual is "otherwise qualified" under the ADA is not limited to whether the applicant can "perform the essential functions" of the position sought. He contends that in the context of preemployment testing accommodations, the "otherwise qualified" inquiry considers instead the individual's ability to perform the "essential functions" of test-taking.

*A. "Test-taker" is not an "employment position" in the circumstances present here.* As explained above, a plaintiff asserting a disability discrimination claim in the employment context must be able to demonstrate that he or she was qualified for the "position at issue." *McBride*, 583 F.3d at 102. The statute provides that the "position at issue," *id.*, is the "employment position that such individual holds or desires," 42 U.S.C. § 12111(8).

As we understand it, Williams's argument proceeds as follows: the "employment position" Williams held or desired at the time of the alleged discrimination was that of

"test-taker." Appellant's Br. at 16. Because the application process was an open one, according to Williams, "any member of the general public," regardless of their qualifications for the job, was eligible and indeed entitled to apply—and thus anyone who wanted to take the exam would be "otherwise qualified" for the test-taking position. Appellant's Reply Br. at 3. Only after the testing process was complete would NYCTA evaluate the experience and education of the candidates, and, coupling that with a passing score on the examination, determine whom to interview. So characterizing the process, he urges that allowing MTA Bus and NYCTA to refuse to provide reasonable accommodations during the exam for certain applicants would effectively greenlight discrimination so long as the employing entities can come up with a post hoc justification for deeming a candidate not "qualified" for the actual employment position sought, in contravention of the purposes of the antidiscrimination statutes.

Williams's policy concerns are not without force, but his argument disregards the plain language of the statute. Williams was not an MTA employee—and thus did not hold an "employment position"—in his capacity as a "test-taker." Rather, as a job applicant, he desired an employment position with MTA Bus. Williams acknowledges that he applied for the Assistant Stockworker position, not a position as "test-taker." Appellant's Br. at 16; *see also* 42 U.S.C. § 12111(8) ("[I]f an employer has prepared a written description . . . for the job, this description shall be considered evidence of the essential functions of the job."). Therefore, the relevant inquiry under the plain language of section 12111(8) is whether Williams was otherwise qualified for the position that he sought and that MTA Bus described—the Assistant Stockworker position. *Cf. McBride*, 583 F.3d at 98–99 (holding that plaintiff's ADA claim failed where she failed to show she was qualified for any of the positions to which she sought to be transferred).

25

*B.* Rosebrough *is not to the contrary.* To support his argument, Williams cites a Sixth Circuit decision, *Rosebrough v. Buckeye Valley High School*, 690 F.3d 427 (6th Cir. 2012), on which *Frilando I* also partially relied, *see* 463 F. Supp. 3d at 514–15. In *Rosebrough*, the plaintiff, who was born without a left hand, was placed in training for a position as a bus driver. 690 F.3d at 429. After disputes related to the plaintiff's disability arose with her supervisor and trainers, the school district did not enable the plaintiff to finish her training. *Id.* at 429–30. She then sued the school district. The Sixth Circuit held that to assert her disability discrimination claim, she need only demonstrate that she was "otherwise qualified" to be a "bus driver trainee," her current "ADA-covered position," and did not need to show she met the requirements for employment as a bus driver, the position she ultimately sought. *Id.* at 432–33. The parties did not dispute that she was qualified as a trainee and indeed had been hired for that position, and on that basis the court reversed the dismissal of her case and remanded for further proceedings. *Id.* at 433; *see id.* at 432 ("[T]he ADA covers individuals in training without regard to whether they are called employees, conditionally-hired employees, [or] trainees . . . .").

We find *Rosebrough* inapposite: the plaintiff there had been provisionally "hired as an employee," subject to completing her training and licensing requirements. [15] *Id.* at 432 (internal quotation marks omitted). In contrast, Williams was applying for a job outright and did not hold any employment position with MTA Bus, provisional or otherwise. Also significant here is the fact that the application instructions for the Assistant Stockworker position made plain that the applicant was obligated to evaluate

---

[15] Williams also cites *EEOC v. Creative Networks, LLC*, 912 F. Supp. 2d 828 (D. Ariz. 2012), in support of his position. That case is also inapposite: there, the defendant-employer Creative Network "d[id] not dispute that [the plaintiff] . . . was qualified for the Direct Support Professional position . . . when she applied for the position." *Id.* at 837.

his qualifications for the job sought before he was eligible for the examination. Although MTA Bus itself would not determine the sufficiency of an applicant's educational and experiential background until after the exam, the Notice left no doubt that the initial obligation to do so fell to the applicant: it stated the qualifications in some detail, advised that the applicant was "responsible for determining whether [he] me[t] the qualification requirements," and warned that a failure to meet the qualifications would not result in a refund of the application fee after the exam. App'x at 59. Thus, in contrast to *Rosebrough*, where the parties agreed that the plaintiff was eligible to become a trainee and, should she complete the trainee program and obtain her commercial driver's license, to become a bus driver, *see* 690 F.3d at 432–33, it was clear from the start here that failure to meet the Notice's qualification requirements would have rendered Williams not only unqualified for the job, but ineligible to take the exam. Because the basic qualifications had been explicitly delineated even before the start of the application process, this situation therefore presents less reason to be concerned about an employer denying testing accommodations and later conjuring up a rationale for why the applicant was not "otherwise qualified."

C. *In conclusion.* In sum, we conclude that in the circumstances presented here, preemployment "test-taker" was not an "employment position" for which Williams was a "qualified individual."  In so ruling, we in no way suggest that employers may deny test-taking accommodations to otherwise qualified applicants, or that an applicant may be found unqualified merely because, as in *Rosebrough*, she has not yet completed the application process. As discussed below, our conclusion means only that an applicant cannot successfully sue a potential employer under the standard set forth in 42 U.S.C. § 12112 when the individual is facially not qualified for the position sought at the time of the preemployment test.

**III. Is there a genuine dispute of material fact as to whether Williams was "otherwise qualified" for the Assistant Stockworker position at MTA Bus?**

Williams contends that even if he must show he was "otherwise qualified" for the Assistant Stockworker position, genuine issues of material fact regarding his qualifications precluded entry of summary judgment for MTA Bus. Appellant's Br. at 21. On *de novo* review of the record, we conclude that no reasonable jury could find that Williams was otherwise qualified for the position.

As discussed above, a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). We have found the term "essential functions" equivalent to "the fundamental job duties of the employment position," as the EEOC has defined the term in its regulations. *McBride*, 583 F.3d at 98 (quoting 29 C.F.R. § 1630.2(n)(1)). The statute and associated regulations direct that evidence of whether a particular job duty constitutes an "essential function[]" may include "the employer's judgment as to what functions of a job are essential" and any "written description [prepared by the employer] before advertising or interviewing applicants," 42 U.S.C. § 12111(8); *see* 29 C.F.R. § 1630.2(n)(3), and "a court must give substantial deference to an employer's judgment as to whether a function is essential to the proper performance of a job," *McBride*, 583 F.3d at 98. To be "otherwise qualified" for the job, a plaintiff must also "satisf[y] the requisite skill, experience, education and other job-related requirements of the employment position." *Id.* (brackets in original) (quoting 29 C.F.R. § 1630.2(m)). The plaintiff bears the burden of demonstrating that "the identified position [is] one for which she was qualified." *Id.* at 96–98.

Here, to prove a disability discrimination claim, Williams must show that he could perform the essential functions of the Assistant Stockworker position, with or

28

without reasonable accommodation—a standard that we interpret with reference to the job qualifications set by MTA Bus. The undisputed facts show that Williams has not done so.

As described above, the Notice gave the following job description:

> Assistant Stock Workers, under supervision, receive, check, classify, store and distribute materials and supplies at the storerooms and facilities of the MTA Bus Company system. This includes: the operation of all material handling equipment; data processing and maintenance of inventory transaction documents; the loading and unloading of trucks; all activities related to normal warehousing and distribution functions; keep records; take inventory; handle obsolete and scrap materials; drives automotive vehicles; and perform related work.

App'x at 58. It announced the following requirements for the job:

> 1. Three years of full-time experience as a stock assistant, stock clerk, or stock worker in an industrial, manufacturing, or wholesaling business which stocks railroad, automotive, machine, aircraft or marine maintenance tools, production parts, or plumbing, hardware or sheet metal supplies and tools; or
>
> 2. Two years of full-time experience as described in #1 above and a four-year high school diploma or its educational equivalent; or
>
> 3. A satisfactory equivalent of education and experience.

*Id.* at 59. It advised, further, that "[e]xperience as a Stock Worker or Stock Clerk in a retail store or experience that involves incidental or occasional stock work" were "<u>not</u> acceptable" to satisfy the experiential requirement. *Id.* (emphasis in original). In addition, it specified that the applicant "must be able to understand and be understood in English." *Id.* Williams does not challenge MTA Bus's determination that the educational and experiential requirements were necessary for the essential functions of the Assistant Stockworker position.

With his application, Williams submitted a resume showing his relevant experience, primarily twenty years of self-employment as a locksmith, a position that listed his responsibilities as including "provid[ing] services to commercial, residential, and emergency establishments"; "install[ing] and repair[ing] of various kinds of locks"; and "conduct[ing] home visits to repair and install locks and services*." Id.* at 72 (capitalization altered). The resume also showed that Williams spent a year and a half working as a "volunteer housekeeping assistant" at the "Hospital For Joint Diseases" from 1992 to 1994. *Id.* This position involved "maintain[ing] patients' rooms and supplies"; "provid[ing] patients with a clean and safe environment through use of various cleaning skills"; and "organiz[ing] and track[ing] the use of tools and equipment needed to complete tasks." *Id.* (capitalization altered).

Williams does not contend that he satisfied the educational or experience requirements numbered 1 and 2 in the Notice. Rather, he argues that, contrary to the conclusion of the district court, he raised genuine issues of material fact as to whether he had the alternative "satisfactory equivalent of education and experience," as provided in number 3. *Id.* at 59.

Williams points to no evidence in the record that he possessed the "satisfactory equivalent of education and experience" required to be an Assistant Stockworker. His resume reflects that he did not have any experience at all as "a stock assistant, stock clerk, or stock worker in an industrial, manufacturing, or wholesaling business," let alone two to three years of such experience. His resume does not identify any experience as a locksmith that required or developed any of the skills specified in the Notice. And his experience volunteering at the Hospital for Joint Diseases could not arguably satisfy the experiential requirement because his work there—in which he helped to maintain patients' rooms and organized and tracked tools and equipment—was not performed in a setting equivalent to an industrial, manufacturing, or

wholesaling business. Williams's volunteer work at the hospital is thus more akin to "incidental or occasional stock work," which the Notice expressly advises is insufficient to count toward equivalency. *Id.*

Testimony given by the Senior Director of Personnel, Testing, Selection, and Classification at NYCTA, Michael Quiery, also demonstrated that Williams did not raise a genuine dispute of fact as to whether he was qualified for the Assistant Stockworker position. Quiery testified that, after reviewing the Notice and Williams's resume, it did "not appear that [Williams] me[t] the minimum qualifications for the position." Supp. App'x at 45. Quiery explained that Williams's experience as a locksmith would not qualify as appropriate experience for the stockworker job because "[t]he jobs are not the same. We're asking for stock work experience [in an] industrial warehouse environment." *Id.* at 58. Quiery observed that locksmithing involves "installing and repairing locks, making keys, unlocking doors. That's not stock work experience." *Id.* at 59. It is true that, in response to questioning by MTA Bus's counsel, Quiery stated there was "insufficient information" in the resume regarding Williams's volunteer housekeeping position to determine whether that limited experience would count toward meeting any of the stated qualifications, but he emphasized that, even if it did, Williams "would not qualify based on" the experience listed on his resume. *Id.* at 55–56.

Williams does not meaningfully challenge this conclusion. Rather, in urging reversal, he contends that when a job applicant is required to take a test before the employer assesses his or her qualifications for the position, that applicant is entitled to accommodations for the test. He maintains that it is discriminatory for employers to deny accommodations to job applicants before determining whether, with reasonable accommodations, that individual could perform the essential functions of the position applied for. *See* Appellant's Br. at 15–16 (arguing that this practice "permit[s] a safe harbor for employers to openly discriminate in job-application procedures if an

31

employer could arguably show that an applicant was not qualified for the underlying job").

Whatever the merits of that argument, those are not the circumstances of this case. Here, although the examination was termed "open," the application process still called for the applicant to assess his or her own qualifications for the job according to those stated in the Notice, in effect to be eligible to take the exam. The process thus called for self-screening. This, the evidence shows, Williams did not do. He nowhere contends that he was in fact qualified for the position, and he points to no evidence that he was; rather, he claims there is a genuine dispute of fact based solely on Quiery's statement that Williams's resume did not provide sufficient information about his hospital housekeeping experience to allow a reviewer to determine whether that volunteer work would count towards "equivalent" experience. In fact, Williams testified that he was hoping to get in the door at MTA Bus and perhaps end up with a locksmith position, one for which he *was* qualified.[16]

On *de novo* review of the record, including the requirements stated in the Notice, Williams's resume, and Quiery's testimony, we agree with the district court that no reasonable jury could find that Williams "satisf[ies] the requisite skill, experience, education and other job-related requirements of the employment position." *McBride*,

---

[16] It is true that by not evaluating Williams's qualifications before refusing to provide him with an ASL interpreter for the exam, MTA Bus ran the risk of denying a reasonable accommodation to a "qualified individual," which could have rendered the company liable for disability discrimination. As discussed above, courts should not countenance such blanket denials of accommodations by accepting specious explanations for why applicants with disabilities may ultimately not be qualified for a position. Whatever concerns might arise from NYCTA employees' representation to Williams that, as a general matter, the agency "do[es] not offer sign language service," App'x at 77, we cannot disregard the statutory requirement that a plaintiff must be a "qualified individual" to maintain a disability discrimination claim under the standard set forth in 42 U.S.C. § 12112. Nor can we ignore the lack of evidence raising any issue of fact as to whether Williams was qualified for the Assistant Stockworker position sought.

583 F.3d at 98. Given that Williams presented no evidence at summary judgment that his housekeeping position was equivalent to the industrial, manufacturing, or wholesaling stockwork experience required by the Notice, or that it went beyond "incidental or occasional stock work," App'x at 59, he has not identified a genuine factual dispute regarding the aptness and sufficiency of his experience when he applied for the Assistant Stockworker position. Thus, regardless of any reasonable accommodation that should have been provided for his disability had Williams been a qualified applicant, we conclude, as a matter of law, that he cannot make out a disability discrimination claim under the Rehabilitation Act or the NYSHRL.

Because we conclude that Williams was not qualified for the position at issue, we also reject his claim that the district court erred in declining to consider whether MTA Bus engaged in the interactive process called for by the statute. As the district court observed, even if Williams had raised such a claim in his complaint (and he did not), an employer's failure to comply with the interactive-process requirement does not provide the basis for an independent cause of action under the ADA. *Williams I*, 2020 WL 1922911, at *9 n.6; *see also McBride*, 583 F.3d at 101 (holding "that an employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA and evidence thereof does not allow a plaintiff to avoid summary judgment unless she also establishes that, at least with the aid of some identified accommodation, she was qualified for the position at issue"). As to the NYSHRL, the New York Court of Appeals has explained that although an employer's "decision to engage in or forgo an interactive process" will frequently be critical to the question of whether a reasonable accommodation was available, the lack of "a good faith interactive process" does not "automatically compel[] a grant of summary judgment to the employee or a verdict in the employee's favor." *Jacobsen v. N.Y.C. Health & Hosps. Corp.*, 22 N.Y.3d 824, 838 (2014). In addition, Williams offers no evidence and makes no claim that, in denying

him an ASL interpreter for the examination, MTA Bus acted with a discriminatory motive, or that its job requirements were pretextual. On this record, the ADA's provisions addressing discrimination in job application processes do not provide Williams with an alternative claim.[17]

## IV. Williams's NYCHRL claim also fails

Williams contends that even if he was not a "qualified individual" under federal law and the NYSHRL, the NYCHRL's broader protections entitled him to reasonable accommodations during the preemployment test. The NYCHRL provides in relevant part:

> (a) . . . Except as provided in paragraph (b), it is an unlawful discriminatory practice for any person prohibited by the provisions of this section from discriminating on the basis of disability not to provide a reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job *or enjoy the right or*

---

[17] On appeal, Williams presses an argument that he first made in his motion for reconsideration before the district court: that regardless of whether he was qualified for the position, MTA Bus's failure to provide him with an accommodation in the application process amounts to a "technical" violation of the law for which he is entitled to at least "nominal" damages. Appellant's Br. at 27–29. The district court did not abuse its discretion in denying the motion for reconsideration on this basis. *See Smith v. Hogan*, 794 F.3d 249, 253 (2d Cir. 2015) ("A district court's denial of a motion for reconsideration is reviewed for abuse of discretion."). First, as the district court observed in its order denying the motion for reconsideration, the argument was waived by Williams's "fail[ure] to raise [the] argument in his summary-judgment briefing." *Williams II*, 2020 WL 4904058, at *2; *see also Analytical Surveys, Inc. v. Tonga Partners, LP*, 684 F.3d 36, 52 (2d Cir. 2012) ("[A] motion for reconsideration . . . is not a vehicle for . . . presenting the case under new theories . . . or otherwise taking a 'second bite at the apple.'"), *as amended* (July 13, 2012). Even if we were to consider this argument, however, it falls short. As explained in the text, Williams has failed to prove a violation of section 504, the NYSHRL, or the NYCHRL: the potential employer's action must be discriminatory with regard to an "otherwise qualified" individual to run afoul of the law. Absent such proof of a violation of the law, he has no entitlement to nominal damages.

34

*rights in question* provided that the disability is known or should have been known by the covered entity.

(b) . . . In any case where the need for reasonable accommodation is placed in issue, it shall be an affirmative defense that the person aggrieved by the alleged discriminatory practice could not, with reasonable accommodation, satisfy the essential requisites of the job *or enjoy the right or rights in question*.

N.Y.C. Admin. Code § 8-107(15) (emphasis added). In Williams's view, the inclusion of the phrase "enjoy the right or rights in question" means that MTA Bus must establish that Williams was not only unable to satisfy the essential requisites of the job, but also unable to enjoy the right of taking the preemployment test with reasonable accommodation.[18]

We have often observed that, "even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 411 (2d Cir. 2015) (per curiam) (citation omitted). But this Court and New York state courts have repeatedly held that under the NYCHRL, like the ADA, a plaintiff bringing a disability discrimination claim in the employment context must be able to perform the essential functions of the job with or without accommodations. In *Melman v. Montefiore Medical Center*, for example, the New York Supreme Court, First Department, reiterated that even in light of the amendments to the NYCHRL requiring a "broad[]" construction of the act, a plaintiff must be qualified for

---

[18] Williams also advances the argument that guidance from the New York City Commission on Human Rights supports his position that accommodations must be provided to any individual who desires to apply for a position, whether qualified or not. N.Y.C. Comm'n on Human Rights, *Legal Enforcement Guidance on Discrimination on the Basis of Disability*, at 89 (June 2018), https://on.nyc.gov/2zu4LKj (providing that its protections apply equally to applicants). As with the EEOC guidance, we find the City guidance unilluminating as to the requirement that a person be able to satisfy the essential requisites of the job.

the job to pursue a discrimination claim. 946 N.Y.S.2d at 30–31; *see also Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 103–04 (2d Cir. 2003) (stating that "we see no reason to think that the NYCHRL and the ADA differ in [the] requirement" that a plaintiff be otherwise qualified for the job).

Williams is correct, however, that the NYCHRL directs that the plaintiff's qualification for the position is not an element of a prima facie case, but rather may be disproven by the employer as an affirmative defense. *See* N.Y.C. Admin. Code § 8-107(15)(b); *Romanello*, 22 N.Y.3d at 885 ("[T]he City HRL provides employers an affirmative defense if the employee cannot, with reasonable accommodation, 'satisfy the essential requisites of the job.'"). Nonetheless, "district courts may still grant summary judgment with respect to NYCHRL claims if there is no genuine dispute as to any material fact regarding plaintiff's claim and the employer's affirmative defense." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013); *see also Giordano v. Mkt. Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010) ("The same standard applies whether summary judgment is granted on the merits or on an affirmative defense . . . .").

Here, as discussed above, there is no genuine dispute that Williams—entirely independent from his hearing impairment—did not have the experience required to qualify for the desired position. MTA Bus put forth evidence that Williams was not qualified for the Associate Stockworker position and Williams has failed to identify any material facts in rebuttal. Nor has Williams provided any basis for concluding that the NYCHRL requires all potential employers to provide testing accommodations for individuals not qualified by experience or education for the positions they seek. In arguing that he was entitled to a reasonable accommodation to permit him to "enjoy the right . . . in question," N.Y.C. Admin. Code § 8-107(15), Williams assumes that he had a

right to take the preemployment exam. But based on the evidence presented at summary judgment, he was not eligible for the exam.[19]

Williams's argument that MTA Bus is liable for failure to engage in the interactive process also fails under the NYCHRL. The New York Court of Appeals held in *Jacobsen v. N.Y.C. Health and Hospitals Corp.* that the NYCHRL, like the NYSHRL, is not violated solely by an employer's failure to participate in a good faith interactive process regarding an employee's requested accommodations. *See* 22 N.Y.3d at 838. Although *Jacobsen*'s holding as to the NYCHRL was subsequently "legislatively modif[ied]" by the City Council in 2018, *Hosking v. Mem'l Sloan-Kettering Cancer Ctr.*, 126 N.Y.S.3d 98, 103 (App. Div. 1st Dep't 2020) (brackets in original); N.Y.C. Admin. Code § 8-107(28)(a)), Williams does not argue that this change applies retroactively.

Accordingly, MTA Bus was entitled to summary judgment on the NYCHRL claim as well.

---

[19] Although the phrase "enjoy the right or rights in question" is not specifically defined, we note that this broader language in the NYCHRL may reflect the fact that unlike the similar provision in section 12112(b)(5)(A), the City law's reasonable accommodation provision also applies outside of the employment context, such as in situations involving access to public accommodations. *See* N.Y.C. Admin. Code § 8-107(4)(a) (making it unlawful for a place or provider of public accommodation to deny, on the basis of a person's actual or perceived disability, "such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation"). Indeed, the "right or rights in question" language has typically been invoked in cases involving discrimination in the context of public accommodations, not employment. *E.g.*, *Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 400 (E.D.N.Y. 2017) (citing this portion of the provision when considering a NYCHRL challenge to a retail store's failure to make its website accessible to visually impaired customers); *Brooklyn Ctr. for Indep. of Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 642–43 (S.D.N.Y. 2013) (same, involving accessibility of City's emergency preparedness program).

**CONCLUSION**

We have considered Williams's remaining arguments and find in them no basis for reversal. For the reasons set forth above, the district court's judgment granting summary judgment in favor of MTA Bus and denying Williams's motion for summary judgment, and its order denying Williams's motion for reconsideration, are **AFFIRMED**.

**Section 101 of the Americans with Disabilities Act (ADA), "Definitions," codified as 42 U.S.C. § 12111, provides in relevant part:**

(8)    Qualified individual

The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

(9)    Reasonable accommodation

The term "reasonable accommodation" may include—

(A)    making existing facilities used by employees readily accessible to and usable by individuals with disabilities, and

(B) job restricting, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

**Section 102 of the ADA, "Discrimination," codified as 42 U.S.C. § 12112, provides in relevant part (emphasis supplied):**

(a)    General rule

No covered entity shall discriminate against a *qualified individual* on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

(b)    Construction

As used in subsection (a), the term "discriminate against a *qualified individual* on the basis of disability" includes—

(1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;

(2) participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's *qualified applicant or employee* with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with an employment or referral agency, labor union, an organization providing fringe benefits to an employee of the covered entity, or an organization providing training and apprenticeship programs);

(3) utilizing standards, criteria, or methods of administration—

   (A) that have the effect of discrimination on the basis of disability; or

   (B) that perpetuate the discrimination of others who are subject to common administrative control;

(4) excluding or otherwise denying equal jobs or benefits to a *qualified individual* because of the known disability of an individual with whom the qualified individual is known to have a relationship or association;

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an *otherwise qualified individual* with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or

   (B) denying employment opportunities to a job applicant or employee who is an *otherwise qualified individual* with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant;

(6) using qualification standards, employment tests or other selection criteria that screen out or tend to screen out *an individual with a disability* or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity; and

(7) failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant (except where such skills are the factors that the test purports to measure).

**Section 504 of the Rehabilitation Act of 1973, "Nondiscrimination under Federal grants and programs," codified as 29 U.S.C. § 794, provides in relevant part:**

(a)     Promulgation of rules and regulations

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

.   .   .   .

(d)     Standards used in determining violation of section

The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201-12204 and 12210), as such sections relate to employment.